UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACHIEVEMENT PREPARATORY ACADEMY PUBLIC CHARTER SCHOOL, | |
| Plaintiff, | Civil Action No. 19-cv-2596 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| CAROLYN WILLIAMS, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Achievement Preparatory Academy, a public charter school for disabled children in Washington, D.C., seeks $107,950.56 in attorneys' fees, plus associated attorneys' fees from the instant lawsuit, from a parent, Carolyn Williams, and her attorneys (collectively, "defendants"), for fees incurred by plaintiff in successfully defending against three due process complaints filed under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, on behalf of Williams' two grade school children, referred to as A.B. and C.W., each of whom is entitled to receive special education services.  *See* Pl.'s Compl. ("Complaint") ¶¶ 7, 44, 45, 83, 86, ECF No. 1; *see id.* 29-30, "Relief" ¶¶ F-J.[1]  In plaintiff's view, an administrative complaint filed on behalf of A.B. and two other such complaints filed on behalf of C.W. were "frivolous, unreasonable and without foundation."  *Id.* at 29, "Relief" ¶¶ A-D.  Pending before the Court are the parties' cross motions for summary judgment. Pl.'s Mot.

---

[1] Plaintiff names as defendants not only Williams but also her attorneys at James E. Brown & Associates, and three attorneys licensed to practice in the District of Columbia and currently or formerly employed at the JEB Firm: Luke McQueen, Maria Mendoza and Kiran Hassan.  Compl. ¶¶ 3–5.

Summ. J. ("Pl.'s MSJ"), ECF No. 18; Defs.' Cross Mot. Summ. J. ("Defs.' MSJ"), ECF No. 20. For the reasons explained below, plaintiff's motion is denied, and defendants' motion is granted.

## I.     BACKGROUND

Between 2015 and 2019, Williams' two minor children, A.B. and C.W., attended school at plaintiff Achievement Preparatory Academy.  The record reflects that Williams paid close attention to her sons' progress—or not—in school and monitored their behavior closely, including by ensuring that both children had the benefit of mental health care outside of the school with their own psychiatrists.  Administrative Record ("AR") 8 at R-15-2, ECF No. 15-8 (Williams explaining that A.B. saw a psychiatrist every two months); AR 25 at R-3-13, ECF No. 15-27 (documenting C.W.'s most recent psychiatrist visit); AR 27 at 16, ECF No. 15-29 (defendants' witness remarking that Williams is an "excellent . . . advocate" for C.W.); *id.* at 52 (demonstrating Williams' awareness of C.W.'s behavior based on her review of his behavior trackers).[2]  During that time, while represented by attorneys employed by Williams' counsel, co-defendant James E. Brown & Associates ("JEB Firm"), a law firm that advocates exclusively on behalf of disabled children and their parents, Williams "filed six separate administrative due process complaints, three on behalf of each of her sons, against [plaintiff]."  Compl. ¶ 7. Williams settled two of these six administrative complaints and withdrew one.  The remaining three were dismissed with prejudice or denied, after administrative hearings, in Hearing Officer's Determinations ("HODs").  The issues that led to each of those six administrative complaints, including the three in which plaintiff prevailed and now seeks attorneys' fees in this lawsuit, are

---

[2]     The Administrative Record submitted by plaintiff consists of 47 discrete files totaling 3,972 pages, and includes *inter alia* Williams' due process complaints, settlement agreements, plaintiff's responses to complaints, administrative hearing filings and transcripts, and final determinations by hearing officers.

briefly reviewed below to provide context for plaintiff's claim that these complaints were frivolous.

### A.    Three Administrative Complaints on A.B.'s Behalf

A.B. suffers from a variety of mental health conditions, including ADHD, bipolar disorder and anxiety, for which he has been prescribed several psychotropic drugs.  *See* AR 8, R-1-11, ECF No. 15-8.  After A.B. exhibited disruptive behaviors at school, including talking out of turn, failing to follow directions, throwing materials and name calling in classroom settings, plaintiff administered, on December 23, 2015, a psychological evaluation.  *Id.* at R-1-1.  Despite these behaviors, plaintiff found A.B. to be ineligible for special education services under the IDEA.  *Id.* at R-2-4.  A.B.'s behaviors persisted, however, leading to Williams' and her counsel to disagree with the ineligibility designation and to insist on a second psychological evaluation, which occurred on May 24, 2017.  *Id.* at R-3-1.  In that evaluation, the psychological evaluator found A.B. eligible for services under the IDEA.  *Id.* at R-3-18.

Less than a month after A.B.'s second evaluation, Williams, represented by the JEB Firm, filed a due process complaint for A.B. ("A.B.'s First Complaint") on June 27, 2017.  *See* AR 1 at 5, ECF No. 15-1.  The following day, at an IEP meeting, plaintiff determined that A.B. was in fact eligible as a student with a disability under the IDEA and proceeded to develop his Individualized Education Program ("IEP"), which was completed on July 26, 2017, a month after A.B.'s First Complaint was filed.  *See* AR 8 at R-4-6, R-8-3, ECF No. 15-8.  Nearly a month later, on August 21, 2017, Williams and plaintiff "entered into settlement agreement resolving A.B.'s First Complaint," Compl. ¶ 11, which resulted in additional services for A.B. that had been requested by Williams and attorneys' fees for the JEB Firm, AR 2 ¶¶ 1-2, ECF No. 15-2.

A.B.'s behavioral issues persisted, and Williams and her counsel asserted several times that A.B. needed a full-time therapeutic environment. *See* AR 8 at R-4-4, R-7-2, R-8-3. By the middle of the next school year, on November 17, 2017, both plaintiff and Williams finally agreed that A.B. needed to be placed at a therapeutic school. *See id.* at R-11-2 – R-11-3 (reflecting that parties agreed on a full time IEP at a private placement). A.B.'s IEP team finalized A.B.'s change in placement on December 19, 2017. *See id.* at R-14-3. Less than two weeks later, on December 26, 2017, Williams, represented by the JEB Firm, filed a second complaint ("A.B.'s Second Complaint") alleging that plaintiff had denied A.B. a free appropriate public education ("FAPE") between June 2017 and December 2017 by failing to provide an appropriate IEP with sufficient hours outside of general education and an appropriate placement. *See* AR 3 at 10, ECF No. 15-3. On January 16, 2018, A.B. began attending Accotink Academy, which is a private therapeutic day school in Virginia. Comp. ¶ 13; *see also* AR 8 at R-15-1, ECF No. 15-8. Thereafter, on February 7, 2018, defendants moved to withdraw the complaint, *id.* at R-28-1, and on February 26, 2018, the hearing officer granted the withdrawal request without prejudice, Compl. ¶16; AR 8 at R-27-51, ECF No. 15-8.

A.B. continued to attend school and receive services at Accotink Academy, but plaintiff remained A.B.'s local educational agency ("LEA"). The IEP team held nine IEP-related meetings for A.B. between February 15, 2017 and April 12, 2018, seven of which occurred prior to his change in placement to Accotink.[3] Williams or her husband were always in attendance. *See id.* at R-2-1, R-4-1, R-7-1, R-8-1, R-11-1, R-13-1, R-14-1, R-15-1, R-19-1.

A.B.'s behavior escalated alarmingly on March 23, 2018, when he threatened to kill a teacher and tied a shoestring around his own neck while in class. *Id.* at R-17-2. These actions

---

[3]     *See* A.R. 8 at R-2-1, R-4-1, R-7-1, R-8-1, R-11-1, R-13-1, R-14-1, R-15-1, R-19-1, ECF No. 15-8. Three of the meetings were convened prior to A.B.'s being deemed eligible for IDEA benefits.

prompted plaintiff to perform an informal psychiatric assessment and prompted defendants to request a formal psychiatric evaluation. *See id.* at R-17-1 – R-17-2. Plaintiff declined to pay for the requested psychiatric evaluation. *See id.* at R-21-1, R-22-2. This incident, paired with plaintiff's subsequent refusal to agree to Williams' request for a psychiatric evaluation of A.B., led Williams to file a third administrative complaint on July 26, 2018. *See* AR 4 at 5, ECF No. 15-4. At an administrative hearing, Williams, represented by JEB Firm, presented testimony from three expert witnesses, two of whom were medical professionals and each of whom opined that A.B.'s increasingly aggressive behavior and homicidal and suicidal threats warranted a psychiatric evaluation. AR 10 at 29, ECF No. 15-12 (Testimony of Tom Dennis Gates, FPMHNP[4]) (explaining that A.B. "would definitely need a psychiatric evaluation" because "[A.B.] has a lot of behavioral problem[s] that can be a safety risk not only to himself but to others, teacher[s], staff and students" and suggesting that "there is a chemical imbalance somewhere [in A.B.] where he is unable to control himself or his impulses"); *id.* at 62 (Testimony of Leah Kennedy, Special Education Advocate for JEB Firm) (articulating opinion that A.B. needed a psychiatric evaluation because of "the increase in the nature of his behaviors, [including] him getting a shoe lace and showing that he wanted to try to commit suicide twice and because of his homicidal threats to staff"); *id.* at 91 (Testimony of Dr. Ashley Elliott, Psy.D.) (explaining that A.B. may require a psychiatric evaluation to get "more data and get a little bit more clarity on what was fueling [A.B.'s] behaviors and what was behind the internalizing of his emotional state"). Nevertheless, the hearing officer concluded that Williams "did not sustain the burden of persuasion by a preponderance of the evidence that [plaintiff] denied [A.B.] a FAPE by failing [to] conduct or authorize funding of a psychiatric evaluation," and therefore dismissed

---

[4]      The acronym "FPMHNP" is a nurse practitioner designation that stands for "Family Psychiatric Mental Health Nurse Practitioner."

her complaint, with prejudice, on November 10, 2018.  AR 13 at 10, 13, ECF No. 15-15.  As the prevailing party, plaintiff now seeks $30,900 in attorneys' fees for its successful defense of A.B.'s Third Complaint.  Compl. at 29, "Relief" ¶ F.

### B.   Three Administrative Complaints on C.W.'s Behalf

Like his brother, C.W. suffers from mental health conditions that affect his behavior in school.  He was diagnosed with ADHD in September 2015.  *See* AR 25 at R-7-2, ECF No. 15-27.  One of his psychological evaluators commented that he also exhibits "significant characteristics of . . . [a c]onduct [d]isorder."  *Id.* at R-10-12.  During the time C.W. was plaintiff's student, he exhibited disruptive behaviors, including exposing himself to other students, *see id.* at R-23-1 – R-23-8, refusing to follow directions, *see id.* at R-25-2, exhibiting aggressive behaviors and engaging in negative interactions with school personnel and his peers, *see id.* at R-26-1, and inappropriate sexual comments, *see id.* at R-23-1.  Notwithstanding these behaviors, plaintiff determined, on February 17, 2016, that C.W. was ineligible for services under the IDEA, much to Williams' dismay.  *See id.* at R-3-14, R-7-1 – R-7-3.

Like his brother, C.W. continued to be disruptive and inappropriate, triggering a reevaluation, at Williams' insistence, on May 26, 2017.  *Id.* at R-10-1; *see id.* at R-7-2.  Based on C.W.'s second evaluation, on June 28, 2017, plaintiff finally agreed with Williams that C.W. was eligible for special education under the IDEA.  *See id.* at R-11-2.[5]  C.W. did not receive his first IEP, however, until the beginning of the next school year, on September 6, 2017.  *See id.* at R-12-1, R-13-1.  In between C.W.'s eligibility designation and the development of his first IEP,

---

[5]   After qualifying as eligible for services under the IDEA, twelve IEP meetings were held for C.W. between June 28, 2017 and May 16, 2019.  *See* A.R. 25 at R-11-1, R-12-1, R-17-1, R-18-1, R-19-1, R-27-1, R-30-1, R-33-1, R-34-1, R-48-1, ECF No. 15-27; AR 35 at R-11-1, ECF No. 15-37; AR 35c at R-35-1, ECF No. 15-40.  Either Williams or her husband attended each of these meetings.  *See* A.R. 25 at R-11-1, R-12-1, R-17-1, R-18-1, R-19-1, R-27-1, R-30-1, R-33-1, R-34-1, R-48-1, ECF No. 15-27; AR 35 at R-11-1, ECF No. 15-37; AR 35c at R-35-1, ECF No. 15-40.

6

Williams, represented by her counsel from JEB Firm, filed an administrative complaint on

C.W.'s behalf ("C.W.'s First Complaint") on July 28, 2017.  *See* AR 14 at 7, ECF No. 15-16.

C.W.'s First Complaint "alleg[ed] that [plaintiff] denied C.W. a free appropriate public education

("FAPE") by failing to find him eligible for IDEA services in February 2016."  Compl. ¶ 47; *see*

*also* AR 14 at 12, ECF No. 15-16.  This administrative complaint was settled by plaintiff with

Williams and her attorneys, with plaintiff agreeing to fund compensatory special education

services for C.W. and to pay $4,800 in attorneys' fees.  *See* AR 15 at 1–2, ECF No. 15-17.

During periodic IEP meetings and other communications between the parties in the fall of

2017 and the first few months of 2018, when C.W. was in the sixth grade, Williams and her

counsel urged consideration of placement of C.W. in a therapeutic school with a more restrictive

setting, but plaintiff disagreed with this request.  *See* AR 25 at R-16-2, R-17-3, R-19-4, ECF No.

15-27; *see also* Compl. ¶ 59. Instead, plaintiff made some modifications in C.W.'s educational

environment, including a change in his classroom seating, an increase in behavior support

services, and advised more communication between his teachers and Williams. *See* AR 25 at R-

17-1 – R-17-3.  By March 2018, however, C.W. was suspended for increasing behavioral issues,

Compl. ¶ 56, prompting plaintiff to take additional steps to address C.W.'s behavioral issues,

including switching C.W.'s advisory class and conducting additional evaluations, *id*. ¶¶ 56–57,

59, 60-65.

On July 10, 2018, after completion of C.W.'s sixth grade year, Williams and her counsel

at JEB Firm filed a second administrative complaint on behalf of C.W. ("C.W.'s Second

Complaint"), alleging that plaintiff had denied him a FAPE by failing to change his placement as

Williams requested in March 2018.  Compl. ¶ 72; *see* AR 16 at 5, 11, ECF No. 15-18.  At the

hearing on this complaint, Williams and her counsel from JEB Firm presented testimony of three

experts, leading the hearing officer to conclude in his December 14, 2018 decision that they "satisf[ied] the burden to present a *prima facie* case" through their testimony and evidence.  AR 29 at 10, ECF No. 15-31.  Nevertheless, the hearing officer concluded that overall plaintiff did not deny C.W. a FAPE by failing to revise his IEP in December 2017, and dismissed C.W.'s Second Complaint with prejudice.  Compl. ¶ 82; AR 29 at 16, ECF No. 15-31.  As the prevailing party, plaintiff now seeks $51,194.44 in attorneys' fees for its successful defense of C.W.'s Second Complaint. Compl. at 29, "Relief" ¶ G.

About four and a half months after the dismissal of C.W.'s Second Complaint, on April 30, 2019, Williams, again represented by her counsel from JEB Firm, filed a third administrative complaint on behalf of C.W. ("C.W.'s Third Complaint").  Compl. ¶ 84; AR 30 at 5, ECF No. 15-32.  C.W.'s Third Complaint alleged that plaintiff failed to provide him a FAPE due to deficiencies in his March 27, 2019 IEP and by not evaluating C.W. in all areas of suspected disability.  *Id.* at 12–13.  At the hearing on this complaint, Williams, represented by her counsel from JEB Firm, presented expert testimony from two experts regarding C.W.'s behavioral and academic regression in the 2018-2019 school year.  AR 38 at 19, 46, ECF No. 19-2.  The hearing officer found that Williams, again, had established a prima facie case regarding her IEP claim, AR 37 at 14, ECF No. 15-46, and further acknowledged both that Williams had consistently, since the fall of 2018, sought a full-time, restricted learning environment for C.W., and that the March 27, 2019 IEP at issue had "not been as effective as hoped in curbing [C.W.'s] challenging behaviors," *id.* at 14, 19.  Nonetheless, the hearing officer concluded, on June 30, 2019, that Williams had failed to meet the burden of persuasion regarding the updates to certain evaluations, resulting in dismissal of C.W.'s Third Complaint without prejudice as to Williams'

IEP claim.  *Id.* at 13, 19.  As the prevailing party, plaintiff now seeks $24,874.69 in attorneys' fees for its successful defense of C.W.'s Third Complaint.  Compl. at 30, "Relief" ¶ H.

### C.    Procedural History

Two months after the denial of C.W.'s Third Complaint, plaintiff initiated this lawsuit for attorney's fees, on August 28, 2019.  Following the filing of the administrative record and completion of briefing, the parties' cross motions for summary judgment became ripe for resolution in May 2020.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a).  In determining whether a genuine dispute as to any material fact exists, the court must "view[] the evidence in the light most favorable to the non-movant." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).  Where, as here, cross-motions for summary judgment are considered, both parties must be accorded "the solicitude owed non-movants," assessing the evidence in the light most favorable to each.  *Id.*  In conducting this analysis, the record must be "taken as a whole."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted) (citing *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S.

253, 289 (1968); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

Plaintiff was indisputably the prevailing party in three, out of the six, administrative proceedings resolved between the parties over the course of two years, between June 2017 and June 2019.[6]  The only disputed issue in this case is whether A.B.'s Third Complaint, and C.W.'s Second and Third Complaints were frivolous, unreasonable and without foundation and/or filed and litigated for improper purposes, such that plaintiff is entitled to recoup the attorneys' fees, totaling $107,947.56, expended in prevailing in three of those administrative proceedings.  *See* Pl.'s MSJ at 6, 17, 25, 32, 44, ECF No. 18-2.  Defendants correctly point out that attorneys' fees are only awarded to prevailing LEAs in very limited circumstances, and argue that plaintiff fails to satisfy the statutory requirements for the fees requested since each of the administrative complaints for which plaintiff now seeks attorneys' fees were supported by substantial evidence and brought for a proper purpose.  *See* Defs.' MSJ at 5, 7, 16, 23–24, 30.  The Court agrees with defendants.

Following review of the standard for awarding attorneys' fees to a prevailing LEA under the IDEA, each of the three administrative complaints for which plaintiff seeks attorneys' fees is examined to assess whether plaintiff has met the requisite statutory standard of frivolity or improper purpose for entitlement to the demanded fee award.

---

[6]     Williams and her counsel do not dispute that plaintiff was the prevailing party in the three administrative proceedings for which plaintiff now seeks attorneys' fees.  Defs.' MSJ at 5; *see Bridges Public Charter School v. Barrie*, 796 F. Supp. 2d 39, 47 (D.D.C. 2011) ("[C]ourts in this district have held that a hearing officer's dismissal on the merits of a due process complaint that has not been appealed warrants a finding that a local education agency is a prevailing party." (citing *District of Columbia v. West*, 699 F. Supp. 2d 273 (D.D.C. 2010))).

A.      **IDEA Standard For Attorneys' Fees to Prevailing LEA**

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A).  Disabled children who qualify for the IDEA are entitled to a FAPE, *id.* § 1412(a)(1)(A), an education that, *inter alia*, "emphasizes special education and related services designed to meet [disabled students'] unique needs and prepare them for further education, employment, and independent living."  *Id.* §1400(d)(1)(A).  A child's eligibility for a FAPE under the IDEA is determined by the results of testing and evaluating the student, and the findings of a "team of qualified professionals and the parent of the child."  *Id.* § 1414(b)(4)(A).  The IDEA also affords certain rights to parents and guardians to advocate for their minor children, including the opportunity to participate in the evaluation, placement and IEP process, *id*. §§ 1414(e), 1415(b)(1), and the right to object to a child's evaluation or educational placement through an administrative due process hearing, *see id.* §§ 1415(b)(6), (f)(1), with the decision of such hearings reviewable in federal court, *see id*. § 1415(i)(2)(A).

District courts may award reasonable attorneys' fees to prevailing parties in IDEA administrative proceedings permitted under 20 U.S.C. § 1415.  *See id.* § 1415(i)(3)(B)(i).  Generally, "the parent of a child with a disability" who is merely "a prevailing party" may be awarded reasonable attorneys' fees, *id*. § 1415(i)(3)(B)(i)(I), subject only to exclusions "for certain services," *id*. § 1415(i)(3)(D), not relevant here.  By contrast, an LEA is only entitled as a prevailing party for an attorneys' fees award under two circumstances: first, "against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable or without foundation," *id*. §

11

1415(i)(3)(B)(i)(II); or, second, "against the attorney of a parent or against the parent, if the

parent's complaint or subsequent cause of action was presented for any improper purpose, such

as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation," *id*. §

1415(i)(3)(B)(i)(III).

Here, plaintiff, as a prevailing party in three of the six administrative proceedings filed by

Williams and her counsel, seeks fees from both Williams and her counsel under both

circumstances set out in subparagraphs (II) and (III) of 20 U.S.C. § 1415(i)(3)(B)(i). To do so,

plaintiff must establish that the three administrative complaints for which attorneys' fees are

sought were "frivolous, unreasonable or without foundation," *id.* at § 1415(i)(3)(b)(i)(II), or have

been brought for an "improper purpose," *id.* at § 1415(i)(3)(b)(i)(III).

To be deemed "frivolous," a complaint must be "'utterly lacking in legal merit and

evidentiary support.'" *Animal Welfare Institute v. Feld Entertainment, Inc.*, 944 F. Supp. 2d 1,

14 (D.D.C. 2013) (quoting *U.S. ex rel. J. Cooper & Assoc., Inc. v. Bernard Hodes Group, Inc.*,

422 F. Supp. 2d 225, 238 (D.D.C. 2006)). "In making this determination, the focus is on the

merits of the case rather than its outcome. That is, whether the IDEA complaint at the time it was

filed was, or later became, 'so lacking in arguable merit as to be groundless or without

foundation.'" *Capital City Pub. Charter Sch. v. Gambale*, 27 F. Supp. 3d 121, 133 (D.D.C.

2014) (quoting *District of Columbia v. West*, 699 F. Supp. 2d 273, 279 (D.D.C. 2010)

(quoting *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985))); *accord*

*Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n*, 434 U.S. 412, 421–22 (1978)

(noting that in applying similar criteria to award attorneys' fees to prevailing employers under

Title VII, "it is important that a district court resist the understandable temptation to engage in

*post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action

must have been unreasonable or without foundation.").  This is such a high bar to meet that, in

this Court, IDEA due process complaints have only been deemed frivolous when found to have

"no factual basis," *Bridges Public Charter Sch. v. Barrie*, 796 F. Supp. 2d 39, 48 (D.D.C. 2011)

("Because defendants had no factual basis for claiming that Bridges did not consult C.R.'s

mother about the IEPs, the Court finds that this claim was without merit"), or to have contained

inaccurate allegations known to be incorrect at the time of filing, *Capital City*, 27 F. Supp. 3d at

134 ("None of these alleged facts was accurate *and Ms. Gambale had full knowledge of the*

*correct facts* when she drafted and filed the IDEA complaint.") (emphasis in original).

The text of section 1415(i)(3)(B)(i)(II) is drawn from the Supreme Court's articulation, in

*Christiansburg*, of the standard to be applied in awarding attorney's fees to prevailing employer-

defendants in employment discrimination cases, under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq.[7]  There, confronted with statutory language granting courts

authority to "allow the prevailing party… a reasonable attorney's fee….," 42 U.S.C. § 2000e-

5(k), the Supreme Court approved an attorney's fee award to a prevailing defendant, "upon a

finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though

not brought in subjective bad faith." *Christiansburg*, 434 U.S. at 421.  The Court further

---

[7]        Section 1415(i)(3)(B)(i)(II) and (III) were added to the IDEA by amendment in 2004.  The legislative
history of the amendment confirms that the statutory text was modeled on the *Christiansburg* standard.  *See* 150
Cong. Rec. H10,011 (statement of Rep. Boehner) (reporting on Conference Report on H.R. 1350, containing the
IDEA amendment and subsequently enacted on December 3, 2004, and stating "I also want to point out one
oversight.  A sentence in the Statement of Managers' language of the Conference Report that provided the
explanation for the attorneys' fees language was inadvertently left out.  By adding at Note 231 sections detailing the
limited circumstances in which the LEAs and SEAS can recover attorneys' fees, specifically sections
615(i)(3)(B)(i)(II) and (III), the Conferees intended to codify the standards set forth in *Christiansburg Garment Co.
v. EEOC*, 434 U.S. 412 (1978).  According to *Christiansburg*, attorneys' fees may only be awarded to defendants in
civil rights cases where the plaintiff's claims are frivolous, without foundation or brought in bad faith.").  Senator
Gregg, the original sponsor of the attorneys' fee IDEA amendment, explained that the *Christiansburg* standard was
meant to serve as a "very high" bar.  150 Cong. Rec. S5,349 (daily ed. May 12, 2004) (statement of Sen. Gregg)
(introducing an amendment incorporated into the later enacted H.R. 1350 and explaining that prevailing defendants
should "rarely [be] able to meet" the "very high standard" for frivolity set by *Christiansburg* and that it is "fair to
apply [the] same standard" from *Christiansburg* to the IDEA).

explained "that the term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case, and that the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him."  *Id*. at 420-21.

      *Christiansburg*, and its progeny, reflect that the frivolity standard is difficult for a prevailing LEA to meet, and with good reason not to undercut Congressional reliance on private individuals to vindicate their statutory rights provided in the IDEA.  As the Ninth Circuit aptly explained in applying the *Christiansburg* standard in an IDEA case, "[l]awyers would be improperly discouraged from taking on potentially meritorious IDEA cases if they risked being saddled with a six-figure judgment for bringing a suit where they have a plausible, though ultimately unsuccessful, argument, as here.  Such a procrustean interpretation of section 1415(i)(3)(B)(i)(II) is inconsistent with the IDEA's objective of 'ensur[ing] that the rights of children with disabilities and parents of such children are protected.'"  *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1126 (9th Cir. 2011) (quoting 20 U.S.C. § 1400(d)(1)(B)) (other citations omitted); *accord Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 236 (1st Cir. 2010) (reversing attorneys' fees award to prevailing defendants in civil rights action, explaining that the *Christiansburg* standard is "difficult to meet, and rightly so. Congress granted parties the prospect of a reasonable attorney's fee under 42 U.S.C. § 1988 to encourage the prosecution of legitimate civil rights claims; to award fees to prevailing defendants when the history of a case does not justify it undercuts that goal and chills civil rights litigation."); *Miller v. Los Angeles Cty. Bd. of Educ.*, 827 F.2d 617, 619 (9th Cir. 1987) (explaining in Title VII case that "[t]he strict nature of the *Christiansburg* standard is premised on the need to avoid undercutting Congress' policy of promoting vigorous prosecution of civil rights violations under Title VII and § 1983.");

*Jones v. Continental Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986) (cautioning that *Christiansburg* standard permits attorney's fee award to defendant-employer in employment discrimination suits under Title VII only in "truly egregious cases of misconduct").

Section 1415(i)(3)(B)(i) (III)'s improper purpose standard was drawn from Rule 11 of the Federal Rule of Civil Procedure, which allows the imposition of sanctions on parties for filing pleadings with an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the costs of litigation." Fed. R. Civ. P. 11(b); *see* 150 Cong. Rec. S5,349 (daily ed. May 12, 2004) (statement of Sen. Gregg) (introducing, as sponsor, IDEA amendment adding Section 1415(i)(3)(B)(i) (II) and (III) to IDEA, explaining that "[t]he second provision in the amendment—that relates to bringing lawsuits for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation—comes from another well-established Federal law: Federal Rule of Civil Procedure 11."). Generally, Rule 11 sanctions may be appropriately awarded when a "reasonable inquiry" would have shown that there was "no basis in law or fact for the asserted claim." *Henok v. Chase Home Finance, LLC*, 922 F. Supp. 2d 110, 126 (D.D.C. 2013) (explaining that "'The test [for sanctions] under Rule 11 is an objective one: that is, whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim.'" (quoting *Sharp v. Rosa Mexicano, D.C., LLC,* 496 F. Supp. 2d 93, 100 (D.D.C. 2007) (alterations in original) (internal quotation marks omitted))). Under Rule 11, the district court retains "broad discretion in imposing sanctions" and is encouraged to consider "'[w]hether the improper conduct was willful, or negligent,' and 'whether it was intended to injure.'" *Hourani v. Mirtchev*, 796 F.3d 1, 17 (D.C. Cir. 2015) (alteration in original) (quoting Fed. R. Civ. P. 11, Advisory Committee Note to 1993 amendment).

**B.      Plaintiff Fails To Meet High Bar Showing Entitlement to Attorneys' Fees**

To establish entitlement to attorney's fees, plaintiff must show not only that it was the prevailing party but also that the statutory standard for an award of fees is met.  Set against the high bar of the statutory standard, plaintiff has failed to demonstrate that the three administrative complaints for which it seeks a fee award were "so lacking in arguable merit" as to be frivolous, unreasonable or without foundation, *Capital City*, 27 F. Supp. 3d at 133 (quoting *West*, 699 F. Supp. 2d at 279), or that these complaints were pursued with improper purpose.

1.      *A.B.'s Third Complaint*

Plaintiff contends that A.B.'s Third Complaint seeking a psychiatric evaluation was frivolous, unreasonable and without foundation because defendants had "no evidence" to support the contention that a psychiatric evaluation was necessary.  Compl. ¶ 104, 110.  For this contention, plaintiff cites four points: (1) at the time A.B.'s Third Complaint was filed, A.B. did not present a danger to himself or others, Pl.'s MSJ at 11; (2) A.B.'s placement was not disputed, *id.* at 12; (3) defendants continued to litigate at the hearing after one of their three witnesses testified that a psychiatric assessment would only be helpful for medication management – a responsibility for which plaintiff is not liable, *id.* at 14; and (4) defendants' request for a psychiatric evaluation was out of step with the prevailing legal standard, Pl.'s Reply Defs.' Opp'n Pl.'s MSJ & Opp. Defs.' MSJ at 7-10 ("Pl.'s Reply"), ECF No. 23.

Defendants persuasively counter each point.  A.B.'s Third Complaint was obviously not frivolous.  Plaintiff's first point cannot be reconciled with the record evidence.  Three months before A.B.'s Third Complaint was filed, A.B. abruptly threatened to kill his teacher and tied a shoelace around his neck, apparently threatening to kill himself.  AR 8 at R-17-2.  Just two weeks before this complaint was filed, A.B. exhibited physically aggressive behavior with both teachers and school property.  *See* AR 8 at R-21-3, ECF No. 15-8.  For plaintiff to posit that A.B.

16

was not a danger to himself or others, or that it was frivolous for defendants to have been concerned that he was a danger to himself or others, borders on absurdity. A.B.'s aggression and his expressions of homicidal and suicidal behaviors clearly raised concern that he was a danger to himself and others, as defendants state. Defs.' MSJ at 12.

Second, plaintiff criticizes defendants for requesting a psychiatric evaluation when placement was not at issue. Yet, as defendants explain, placement was not challenged at the time of A.B.'s Third Complaint because the psychiatric evaluation they sought would have determined whether a change in placement was warranted. Defs.' MSJ at 14. Furthermore, the IDEA provides that an LEA "shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(ii). Reevaluations must occur "at least once every 3 years," but may not occur more than once a year, unless the parent and the LEA agree otherwise. *Id.* at § 1414(a)(2)(B). Thus, Williams was well within her rights to challenge the LEA for failing to agree to a psychiatric evaluation given A.B.'s increasingly violent behavior, even if that child's placement was not at issue.

Third, contrary to plaintiff's point, defendants' case was not rendered frivolous by a single witness, who opined that a psychiatric evaluation was only informative for medication management, given that defendants presented substantial evidence at the administrative hearing, through three expert witnesses, who each recommended A.B. receive a formal psychiatric evaluation. Defs.' MSJ at 11. While the hearing officer was not persuaded and determined that a neuropsychological evaluation would be more appropriate than a psychiatric evaluation for determining A.B.'s educational programming, *see* AR 13 at 12, ECF No. 15-15, each of defendants' witnesses, in some form, recommended that A.B. receive a psychiatric evaluation

given his behavior.  *See* AR 10 at 62, ECF No. 15-12 (Kennedy Testimony) ("That is the reason

why I continue to request for the psychiatric evaluation . . . because something has to give . . .

[we are] working with him and nothing seems to be working. So my only thing that I knew from

based off of my profession and what I've learned over the years is to ask for a psychiatrist['s]

input on how to program for this student while he's at school"); *id*. at 91, 93–94 (Elliott

Testimony) (stating ". . . I really want them to complete a psychiatric [evaluation] to give us

more diagnostic clarity" and that a psychiatrist is able to determine whether a person has a "basic

mental health psychopathology or . . . a medical diagnosis related to hormones are neurological

functioning or some type of other issue within the body"); *see also id.* at 29 (Gates Testimony)

(". . . he would definitely need a psychiatric evaluation.").  One statement from defendants'

witness Gates opining that a psychiatric evaluation would only be helpful for medication

management, *id.* at 31, after advocating for much of his testimony that A.B. should undergo a

psychiatric evaluation does not substantially undermine the other substantial evidence on this

point, particularly given that this opinion highlighted by plaintiff was contradicted by the expert

testimony of a doctor, who recommended a psychiatric evaluation for "diagnostic clarity," *id.* at

91.

Finally, again contrary to plaintiff's point, legal precedent indicates Williams could seek

an evaluation based on the advice of an educational expert, Defs.' MSJ at 13, and, consequently,

plaintiff is just wrong in asserting that defendants' request for the evaluation was so unsupported

by the prevailing legal standard as to be frivolous.  As already noted, the IDEA requires LEAs to

reevaluate students every three years and permits LEAs to reevaluate a student more than once in

one year if a parent and an LEA so agree.  *See* 20 U.S.C. § 1414 (a)(2)(B).  The statute also

requires LEAs to assess children in "all areas of suspected disability."  *Id.* at § 1414(b)(3)(B).

Plaintiff, of its own accord, assessed A.B. in response to his March 2018 behavioral episode, suggesting that plaintiff found this behavior so alarming as to warrant a reevaluation.  Further, the new patterns in A.B.'s behavior that arose between March and July 2018 could have reasonably been evidence of a yet undiagnosed disability.  As such, defendants had an adequately compelling justification for requesting a reevaluation under applicable law.

Taken together, plaintiff has presented no viable evidence or arguments that A.B.'s Third Complaint was frivolous.

### 2.    *C.W.'s Second Complaint*

Plaintiff also challenges C.W.'s Second Complaint as frivolous, unreasonable and without foundation, Compl. ¶ 129, because defendants allegedly (1) failed to provide any evidence in support of their claim that the IEP should have been revised in December 2017, *id.* ¶ 134; and (2) had no legal authority to challenge the agreed-upon IEP, finalized on September 5, 2017, after three months of implementation, *id.* ¶¶ 130, 133.   This challenge also falls far short of showing the requisite frivolousness of this complaint.

First, as defendants correctly assert, the record establishes that defendants offered plenty of evidence indicating that the IEP should have been revised in December 2017.  Defs.' MSJ at 20.  Williams repeatedly requested that the IEP be amended to include a more restrictive placement for C.W. in the first half of the 2017-2018 school year with no results.  *See* AR 25 at R-16-1, R-17-3, ECF No. 15-27.  Her experts also testified the less restrictive environment in which C.W. was placed during that first semester of the school year raised safety concerns, given C.W.'s behavior.  *See* AR 27 at 18–22, ECF No. 15-29 (Special Education Advocate Halima Odom Testimony) (". . .he was speaking aggressively and making threats to particular teachers in school. . . I believe that at the beginning of the school year there was an incident when he ran out

of school").  Considering this evidence, the hearing officer noted in the HOD that "the testimony and evidence made clear" Williams had presented a prima facie case, AR 29 at 10, ECF No. 15-31, that there were "credible reports" that C.W. engaged in "inappropriate behavior on numerous occasions between September, 2017, and December, 2017," *id.* at 13, and that C.W.'s testing scores "reflected some regression," *id.* at 14.  Defendants' evidence here was more than enough to overcome an allegation of frivolity.

Second, contrary to plaintiff's position, legal precedent supports challenging an IEP within three months of implementation.  Defs.' MSJ at 23.  The text of the IDEA is clear that IEP teams must "revise the IEP as appropriate" to address lack of progress toward annual goals, results of re-evaluations, information about the child provided to or by the parents, the child's anticipated needs, or "other matters."  20 U.S.C. § 1414(d)(4)(A)(ii).  C.W.'s worsening behavior and scholastic regression is enough to trigger this provision on its face.

As to C.W.'s Second Complaint, plaintiff has failed to show entitlement to attorneys' fees under section 1415(i)(3)(b)(i)(II).

### 3.   *C.W.'s Third Complaint*

Plaintiff challenges C.W.'s Third Complaint as frivolous, unreasonable and without foundation on two grounds: (1) Williams agreed to the March 27, 2019 IEP and therefore could not challenge this IEP only one month after its amendment, Compl. ¶¶ 140, 142; and (2) defendants presented no evidence showing that they had requested a functional behavioral assessment ("FBA") or that C.W.'s behavioral intervention plan ("BIP") was inappropriate prior to filing the complaint, *id.* ¶ 142 – 44.  Again, in context, this challenged complaint was not frivolous.

First, Williams' agreement with, and subsequent challenge to, the March 27, 2019 IEP is not indicative of frivolity. To the contrary, Williams and her counsel continuously and for months, or even years, sought a more restrictive environment for C.W. but to no avail. *See* AR 25 at R-16-2, R-17-3, R-19-4, ECF No. 15-27; AR 35 at R-9-4, ECF No. 15-37 (voicing disagreement with plaintiff regarding C.W.'s need for a more restrictive setting); *see also* AR 25 at R-23-3, ECF No. 15-27 (plaintiff offering parent-requested change in placement referral). Thus, in context, the record shows that Williams' agreement to the March 27, 2019 IEP was most likely mere acquiescence to the IEP that plaintiff was willing to provide, rather than an agreement with all the terms of that IEP itself. In fact, while the hearing officer ultimately found for plaintiff, he signaled that defendants' claim had some merit by concluding in the HOD that Williams made a prima facie showing "through her expert witnesses that the March 27, 2019 IEP was not adequate," recognizing that she had, through her legal representatives, been seeking a "full-time, self-contained educational setting" for C.W. since "at least" the fall of 2018, AR 37 at 14, ECF No. 15-46, and by dismissing the complaint *without* prejudice, *id.* at 19.

Second, whether defendants explicitly requested an FBA or an update to the BIP prior to filing their complaint is not dispositive as to the frivolity of the complaint. An FBA is a "systematic set of strategies that are used to determine the underlying function or purpose of a behavior so that an effective behavior management plan can be developed," AR 37 at 12, ECF No. 15-46 (citing *Banks v. St. James Par. Sch. Bd.*, No 2:65-cv-16273, 2017 WL 2554472 (E.D.La. Jan. 30, 2017).[8] An FBA is used to inform a student's BIP, which relies on an accurate

---

[8]     *See also* Gerardo Moreno et al., *Investigation on the Practice of the Functional Behavioral Assessment: Survey of Educators and Their Experiences in the Field*, 9 INT'L J. OF EMOTIONAL EDUC. 54, 55 (2017) (describing an FBA as a data gathering assessment IEP teams use to evaluate behavioral influences and identify the reasons behind challenging behaviors).

FBA to be effective. [9]  LEAs are required to conduct an additional FBA of the child if it

determines that the needs of the child warrant a reevaluation or if the child's parent requests a

reevaluation.  *See* 34 CFR § 300.303(a).  As noted by the hearing officer, an LEA's failure to

"complete an FBA and develop a [BIP], when warranted, will constitute a denial of a FAPE,"

which a parent is entitled to challenge through the due process complaint process.  AR 37 at 12,

ECF No. 15-46 (citing *Long v. District of Columbia*, 780 F. Supp. 2d 49, 61 (D.D.C. 2011)).

Here, defendants were justified in challenging plaintiff's failure to determine whether

C.W. required another FBA.  Defendants presented evidence at the administrative hearing that an

FBA and BIP were needed.  Defs.' MSJ at 25–28.  Based on that evidence, the hearing officer

could have concluded that plaintiff had shirked its duty to provide C.W. with a FAPE for failing

to conduct an FBA to update C.W.'s BIP, given that C.W. was regressing behaviorally and

scholastically during the 2018-2019 school year, compounded by the additional facts that C.W.'s

existing BIP was consistently failing to ameliorate his behavioral issues, *see* AR 35 at R-11-5,

ECF No. 15-37 (Williams' special education advocate Odom explaining in the March 27, 2019

IEP meeting that plaintiff had been "unsuccessful with being able to identify what [C.W.'s]

triggers are"), and that there were mounting concerns about C.W.'s safety at school, *see* AR 38 at

54-55, ECF No. 19-1 (Odom Testimony) (explaining that C.W.'s frequent elopements from

school had become a "safety issue").

The substantive merit of the hearing officer's determination is not before this Court for

review, however, while plaintiff's challenge to the complaint as frivolous is.  The latter challenge

is easily dispatched and rejected.  Plaintiff's critical view of the timing of Williams' requested

updates to C.W.'s FBA and BIP shows a blatant failure to appreciate how frantic a mother may

---

[9]      *See* Kristine Jolivette et al., *Functional Behavioral Assessment as Collaborative Process Among Professionals*, 23 EDUC. AND TREATMENT OF CHILD. 298, 309 (2000).

feel when observing a child's continuing regression over the course of a school year, while the school itself resists taking evaluative steps to remediate even those issues contributing to unsafe conditions.

In sum, plaintiff has failed to show entitlement to attorneys' fees for C.W.'s Third Complaint.[10]

## IV.     CONCLUSION

For the foregoing reasons, plaintiff has failed to show entitlement to an award of attorneys' fees under IDEA § 1415(i)(3)(b)(i)(II) and (III) for any of the three administrative complaints at issue.  Accordingly, defendants' Cross Motion for Summary Judgment, ECF No. 20, is granted and plaintiff's Motion for Summary Judgment, ECF No. 18, is denied.  An Order consistent with this Memorandum Opinion will be filed contemporaneously.


Date: August 25, 2020


                                                          _____
                                                          BERYL A. HOWELL
                                                          Chief Judge

---

[10]     In addition to asserting that the three complaints at issue were frivolous, plaintiff also alleges that Williams and her attorneys filed them for an improper purpose because (1) they were frivolous, Compl. ¶¶ 151 – 52, (2) filed "simultaneously" for both children, *id*. ¶¶ 153 – 55, and (3) unjustifiably pursued all the way to the hearing stage because Williams' fee agreement with her counsel permitted her to "avoid paying attorneys' fees" if she refused to settle, *id*. ¶¶ 159–60.  This improper purpose challenge to the three administrative complaints fares no better than plaintiff's frivolity challenge.  As fully discussed in the text, *supra,* the complaints were not frivolous, rendering plaintiff's first argument dead in the water.  Further, none of the challenged complaints were filed simultaneously, as erroneously stated by plaintiff.  *See* AR 1 at 5, ECF No. 15-1; AR 3 at 5, ECF No. 15-3; AR 4 at 5, ECF No. 15-4; AR 14 at 6, ECF No. 15-16; AR 16 at 5, ECF No. 15-18; AR 30 at 5, ECF No. 15-32.  To the extent any of the challenged complaints were filed near in time to any other complaint on behalf of A.B. or C.W., the lack of any challenge as to, or finding of frivolity regarding, any of the six complaints makes their timing irrelevant and certainly not probative of any improper purpose.  Finally, plaintiff's allegation about Williams' fee agreement with her counsel rests solely on her response to a single question at the hearing on C.W.'s Second Complaint, which inquired as to her understanding of the agreement.  *See* AR 27 at 61, ECF No. 15-29.  No evidence suggests that the terms of this fee agreement *motivated* Williams to file C.W.'s Second Complaint, or any other complaint for that matter.  As such, plaintiff has failed to present adequate evidence to show Williams' complaints on behalf of her two sons were filed for any other reason than to ensure that her children were receiving the FAPE to which they were entitled, and not for any improper purpose.